Case number 18-4189 Stephen Shakkuri v. William P Barr Oral Argument at 20315 Mississippi Side Please be noted for the petition Morning, your honor. May it please the court, my name is Edward Bajoka and I am here today representing Stephen Shakkuri. Mr. Shakkuri is here present in the courtroom with his three minutes for rebuttal. Your honor, Mr. Shakkuri is a Chaldean Christian who was born in Iraq. He arrived in the United States when he was a small child, around the age of two years old. The Chaldean Christian people are a marginalized, persecuted ethnic and religious group in Iraq. In 2016, the then Secretary of State John Kerry acknowledged a genocide that had happened against not only Iraqi Christians but also other minorities in that country. Mr. Shakkuri is Americanized. Again, he's been here since he was two years old. His entire family are U.S. citizens. He has not been back to Iraq since he was two years old. He does not possess an Iraqi ID or an Iraqi travel document. He does not speak Arabic. He has no family connections in Iraq. He has no acquaintances in Iraq. He knows no one in that country. He would be in really great shape if he hadn't committed some crimes, right? I would agree with that, your honor, yes. He'd probably just sail through fine. I agree. And Mr. Shakkuri is not making any excuses for his criminal history. He acknowledges his criminal history and he realizes that that is the reason that he is in the position that he's in today. I think the question is the legal issue of whether or not this country believes that it should send people back to what I believe is a almost certain risk of torture or death and whether or not committing a crime of the nature that he committed should equal a death sentence. I think that's what it amounts to for Mr. Shakkuri. Your honor, in this case, the Board of Immigration Appeals misapplied the law, particularly with regard to the burden of proof when it applied matter of JFF and it applied the causal link or causal chain test to the determination of whether or not it's more likely than not that Mr. Shakkuri would return to Iraq. In that case, in the matter of JFF case, the immigration court and the board dealt with a Dominican individual who had suffered from severe mental health issues and the immigration judge, despite the respondent in that case having provided almost no proof or no evidence, strung together this series of suppositions that if he were returned to the Dominican Republic that he would at some point face torture or be apprehended because there was no mental health treatment that's available in that country. This case differs greatly and the court relied almost exclusively on matter of JFF and applied that test as opposed to the more likely than not standard, which is what's called for by the case like this. It's not like the typical immigration case. I believe it's your standard of review is de novo, Your Honor. You do? What's your best case for that? I'd have to look in my brief. You can cite it later. Thank you, Your Honor. So in this case, Your Honor, the board applied and elevated the standard that is required or the standard that Mr. Shakouri provided a number of independent bases for his risk of torture, which I highlighted earlier. And the court, instead of the Board of Immigration Appeals and the Immigration Court, instead of aggregating those and finding that he was subject to the more likely than a causal link or a chain that would lead to a finding of more likely than not probability that he would be tortured or killed if returned to his home country. I guess I have one question, which kind of goes to what Judge Seiler asked. There are some issues that we may be foreclosed from hearing. We may not have jurisdiction here. And one of those issues may be determinations of questions of fact. And we do have this Chabot decision that says that something to the fact that when the court defines that it was not more likely than not double negative, I guess, that he would be tortured if returned to Iraq. That's a factual determination. And as such, we would not have jurisdiction to consider it. I'm just wondering if you have a response to that. I do, Your Honor. I do believe this court has jurisdiction. I think that the issues that I presented in my brief are legal issues and constitutional issues. Whether or not the proper law was applied, I believe, is a squarely legal issue. Whether or not the proper burden of proof was used is, I believe, squarely a legal issue. I probably agree with you there. I'm just wondering about this Chabot decision and whether you think it's a decision that does not apply here for some reason. Your Honor, I actually used, I quoted Chabot in my brief multiple times. And I think that some of the findings in Chabot talk about legal and factual issues and when the court does have jurisdiction. I believe that the court does have jurisdiction. What's the most critical constitutional or legal issue that you're attacking here? Your Honor, I think it's that the Board of Immigration Appeals and the it applied the matter-of-JFF case as opposed to applying the more likely-than-not standard. What do you base that on? Your Honor, the matter-of-JFF case is this case that talks about a causal link, that there has to be a link in multiple chains of things that have to happen before you can prove that there's torture or that there would be torture, that it's more likely than there would be torture. In this case, there are multiple independent reasons or factors that would put Mr. Shikori at risk of torture or death if he's returned to Iraq. So it's not the causal link test is not the appropriate test and should not have been used in this case. The court in this factual determinations, are they not, what factual determinations are you referring to? And even if there were such determinations, can we consider those since we're really, we have jurisdiction to evaluate constitutional arguments more so than factual determinations? Thank you, Your Honor, and I would agree that there are some factual issues here. The issues, though, that we're asking the court to decide are, and the primary one, I think the most important one, is whether or not the proper law was applied. That is a legal issue. It's a constitutional issue. I believe it fits squarely within the jurisdiction of the court. It's not just that, it's not just a matter of legal issues. The legal issues have to be of constitutional import, do they not? Yes. And what issues are you identifying that rise to that level? Your Honor, I think when the court and the immigration court and the board elevated the burden of proof that was required for Mr. Shikori by misapplying the wrong law and the wrong legal standard, that it's a due process issue. Well, what's the basis for the claim that the incorrect burden of proof was utilized? I mean, you keep saying that, but you're not explaining the basis for that contention that you're making. Your Honor, if I can explain a little more in detail. So the case that was used, or the statute, calls for a more likely than not standard to be applied. In this case, the standard that was applied was a causal link chain test that elevates the burden that he would have to prove. Well, if you could explain, I mean, that's a conclusive statement. I'm still not following your argument. Well, why are you reaching that conclusion? Your Honor, the issue is that Mr. Shikori, so the statute calls for, as I stated, the more likely than not standard. The case that was used to decide Mr. Shikori's case, this causal link chain test, it elevates the burden of proof. It does more than what the statute calls for. It calls for him to have to prove something additional. It makes it almost impossible. What does the immigration judge say that causes you to arrive at that opinion? Your Honor, in both the board decision and in the IJA decision, the immigration judge decision, it specifically says in there that Mr. Shikori has not proven each link in the causal chain. And so the argument is essentially that the causal chain elevates the burden of proof that he's required to show. He's required to show that it would be more likely than not that he would be tortured or killed. You're not explaining why the judge was incorrect in whatever statement was made. Oh, sure. Well, Your Honor, I can... Oh, there you go. Or if you factors that lead to, I believe, lead to a finding that he would be tortured or killed if returned are independent factors. The ones I stated earlier, that he has been in the country of the United States since a small age, does not speak Arabic, that he's Christian, that he's Chaldean, et cetera, et cetera. These are independent factors, not interdependent factors. And the court analyzed this and looked at these as interdependent factors and applied this causal chain test. The court should have aggregated these, looked at them as an aggregate and determined that it's more likely than not that based on the totality of the circumstances that it's more likely than not that he would have been, that he'll be tortured or killed if he's returned to Iraq. The BIA determined and the immigration judge found that Mr. Shoukri could safely relocate in one part of Iraq, the Nineveh area. Was there evidence to the contrary? Your Honor, there's a lot of evidence to the contrary. And in fact, that evidence is evolving every single day. There was just released, I think, earlier, late last week, 2018 Religious Freedom Report, which talks... That's not the record here. It's not. Correct, Your Honor. It's not part of the record. I'm just... But he could resettle in the Kurdish section of Iraq, could he not? He could not, Your Honor. I don't believe there's any safe relocation area for him. But there was evidence in the record that would support a determination that that was safe. I mean, there was certainly evidence, if I'm correct, that he could relocate in this Nineveh Valley. Your Honor, I believe the government did provide some evidence of that. However, in our brief, we also argued that the board did not provide an explanation of that particular issue. So they didn't provide a full analysis of whether or not he could safely relocate in Iraq. So that was an issue that was up for contention, that was not dealt with. That's our argument on that. You have your full rebuttal time. Thank you. Thank you very much, Your Honor. May it please the court, Lindsay Corliss for the respondent. This court should dismiss this petition for review. This court's jurisdiction is limited to colorable constitutional claims and legal issues because petitioner was found removable based on his convictions for an aggravated felony and for multiple crimes involving moral turpitude. Now, petitioner's claim is no However, his arguments before this court are all either not meritorious, unexhausted, or are actually veiled requests for this court to reweigh the evidence and find in his favor, which does exceed the jurisdictional limitation. First, petitioner has discussed whether or not the board disaggregated his claim and in doing so heightened his burden of proof beyond the more likely than standard for cap protection. Now, nothing in the board's decisions or in the immigration judge's decision suggests that they were taking his claim in such a piecemeal fashion. The board and the immigration judge discussed the expert reports that were filed by the Department of Homeland Security that they found to be more persuasive than the reports that petitioner filed. Now, those experts also discussed all of the factors that petitioner identified, that he was a Christian, that he had criminal convictions in the United States, that he was a long-term resident of the United States and westernized, and they looked at all of those factors together and said those factors are not the factors that put someone at risk in Iraq currently today in 2008, or at that time in 2008. Instead, the factors that might put someone at risk in Iraq are being suspected of being a member of ISIS, being suspected of being a member of the former Ba'athist regime, or also whether or not they have outstanding warrants for criminal convictions in Iraq. So petitioner's long-standing residence in the United States actually exonerates him of those things. And the experts, you can see on page 801, Dr. Natale is talking about this, and she says, while challenges can be significant and should not be minimized, they do not translate into an appreciable risk of persecution or torture for every Iraqi who is deported from the United States to Iraq, whether that person is a member of a religious or ethnic minority or not. So you see her combining those factors, that he's being deported from the United States, that he was a long-term resident of the United States, that he's a religious minority. So she's combining those things. You see Douglas Olivent, another expert presented by the DHS, does that same thing on page 858. He combines who have also been westernized and their risk factors in Iraq. He's afraid he's going to be grabbed when he gets deported there, and the authorities will torture him there. Is there any proof of that, that it might happen? Right. So that was the claim that was put forth by one of the individuals who wrote a report for the immigration judge to find the chain of hypotheticals to not meet that standard. So Petitioner presented evidence from a couple of experts that really talked about generalized country conditions. Mark Latimer and Dr. Macco wrote reports that talked about how Iraq currently is unsafe, but they didn't get to any sort of particulars as far as how Petitioner would actually be individually targeted for harm, which is what is required for him to show under the cat. Was there any kind of an expert who said that when he would arrive in Iraq he would have all this problem, he'd get hassled because he'd been in the U.S. and thought he might be a member of ISIS or one of these other problems? Yes. Daniel Smith is an individual that wrote a report. Now has lived in Iraq. The immigration judge, as upheld by the board, determined that Daniel Smith did not have sufficient rigor in his qualifications or represented in his CV in order to demonstrate that he was an expert. So the immigration judge, as upheld by the board, determined that he was a precipient witness reporting on things that he had heard or that people had told him or that he had seen himself in Iraq, but that he was not a country conditions expert who was capable of filtering the things that individuals were telling him among, you know, a broader understanding of country conditions in Iraq. But the scenario that Daniel Heller proposed was that when he arrived in Iraq, that any of those risk factors that Petitioner identified, his Christianity, the fact that he'd been in the United States, his criminal convictions, that he would then be detained and then after he was detained he would be interrogated. After he was interrogated he would be transferred to a facility for a long-term detention, that that facility would be one of the facilities in Iraq that does use torture methods, and then that he would actually be one of the people who would be tortured in that facility. That is precisely the chain of hypotheticals that the immigration judge didn't see in enough evidence to prove that the entire scenario would be more likely than not to occur. And so, and in fact, there were, the government presented several expert reports that refuted Daniel Smith's claims and instead stated that any detention would be only to ascertain his identity and that he would then be released. That what the Iraqi government is interested in when they detain someone is making sure that they're not a member of the former Ba'athist regime, and that they're not, that they weren't members of ISIS, or that they don't have outstanding criminal warrants in Iraq. One of the problems may have been for Mr. Shoukri, and I'd like your testimony of Mr. Heller, Mr. Smith and Ms. Heller, just as quote-unquote, precipient witnesses, as opposed to experts, when Mr. Shoukri really proctored them as experts, and they've been used as experts in, I think, similar issues in other immigration cases. And so one of the arguments is that you then have a precipient with witnesses who don't have the same weight of testimony that the government's experts had, and that that then resulted in an error that hurt Mr. Shoukri's case. I understand that. That issue was not exhausted, and part of the reason why it's important that that sort of issue be exhausted before the board is because I could stand here and speculate as far as many different reasons why those individuals might have been accepted as experts in other cases, but not in this one. For instance, we know based on this transcript that Daniel Smith had at least three CVs. We know that in this transcript he didn't, so I don't know if another CV was in another case. You know, in this case he chose not to appear for voir dire, so he never defended his credentials in person or telephonically. I don't know if he defended his credentials in another case. Also, we don't know what kinds of objections DHS may have raised in those other cases, or if they may raise any objections at all. If this court wants to look on starting page 297 of the record, that's when DHS raises several specific objections, both to Ms. Heller and to Mr. Smith's designation as expert witnesses. And the DHS points out that Mr. Smith didn't include any education whatsoever on his CV. They said he's a journalist working in Iraq, but many journalists, you know, when somebody files for asylum and they present evidence, often they're including news reports written by journalists in these countries. They're taken as evidence, sure, that this journalist has been told or has witnessed this and has written it down, but the court doesn't look at that as though the person who wrote that has the ability to filter whatever they saw or heard through a broader understanding of country conditions in Iraq. So these sorts of objections were raised before the immigration judge in this case. But I don't know what was... I'm sorry. I guess my question, much has been said about this aggregation issue, and I guess my understanding of that issue is, you know, they aggregated the source of the threat. So the source was, the claim is that the Iraqi government and then also this government sponsored, I forgot, popular mobilization front, but a PMF, in the aggregate, posed more than likely than not that there would be Does the record reflect that that occurred, that there was this aggregation? So the record reflects that both the immigration judge and the board went through all of these different aspects of his claim, and they did discuss them, and they discussed them together. And basically the conclusion was the experts say that these people are not at risk, that people like Petitioner, similarly situated Petitioner, are not at risk from the PMF or from the Iraqi government. That's how the experts analyzed the claim, and that's how the board and the immigration judge analyzed the claim. They only get to that citation to JFF, that's that issue, after discussing Petitioner's claim for about three or four pages. And they're discussing all of the different aspects of his claim and why they're finding the experts from the government to be more persuasive than the experts or purported experts that Petitioner put forth. And so there's simply no reason to believe that they disaggregated the claim. Once again, Petitioner didn't exhaust the claim that the immigration judge had disaggregated the claim when he appeals the immigration judge's decision to the board. So the board didn't have reason to address whether or not it agreed that the immigration judge had done so. But when you read the decision, there's no indication that he said, okay, I'm going to talk about Christians in Iraq now. Now I'm going to talk about westernized people in Iraq now. There's no sort of separation of those claims. He goes through, these are the risk factors that the government identified, and Petitioner isn't any of those. These are the risk factors that Petitioner identified and it doesn't seem like there's enough evidence to support that. So you can see that the agency was grappling with all of the factors. It seems that Petitioner is expanding from one citation to one case, which was appropriate given Daniel Smith's interpretation of what might happen to Petitioner and trying to claim that there's evidence that the agency disaggregated the claim. Did the board consider whether he could resettle up in the Kurdish section or some other place within Iraq? There's no relocation finding. However, cap protection is a countrywide protection. So if there's a place that Petitioner can live without facing or being individually targeted for harm, then that is sufficient to find that he did not meet his burden. You can see, so for an example, the immigration judge relies on the report from Dr. Rubin, where Dr. Rubin says that broad, this is on page 870, broad swaths of Iraq, including Iraqi Kurdistan, Baghdad, Najaf and Karbala, for example, are now stable and secure and the threat of violence to individual returnees from either the PMF or the Islamic Petitioner presented evidence saying that those are ghost towns, although they do, even Petitioner's experts, even they admit that Christian militias do protect those areas. And then you have a finding. What's that? No finding was made. No finding was made about relocation. I see that my time is almost up, so I'll just quickly mention that Petitioner also submitted new evidence on appeal, which the board correctly construed to be a motion to remand, because it was not a fact-finding body. It couldn't make, it couldn't find new facts based on new evidence. And the board, there's no legal or constitutional error in the board's finding that Petitioner didn't qualify for a motion to remand. Petitioner states that the board didn't provide a reason and explanation for not remanding based on the new expert reports. However, the board explained that Petitioner had failed to explain why the expert reports were previously unavailable. Also, Petitioner states that the board ignored its precedent by not remanding based on the country conditions report, where the board actually stated that Petitioner hadn't met his burden to show that the country reports showed that country conditions had materially changed for Petitioner. But with that, I will ask that this court dismiss the petition for review. Thank you. Thank you. Thank you. Just briefly, I'd like to just quote from Shabo, actually. Questions of law include whether the BIA used the correct standard in reviewing the IJ's decision and whether it assigned him the correct burden of proof. Direct quote from Shabo v. Sessions. And I think that's precisely what's at issue here with regard to the whole aggregate issue that's been discussed and whether or not matter of JFF and that burden in that case and the application of that case elevated the burden of proof that Mr. Shakouri was required to prove. So I believe that this court has jurisdiction. I believe that the burden of proof that was applied was improper. And I would open to any other questions. And if the court has none, then I will thank the court for its time and on behalf of Mr. Shakouri and his family. Okay. Thank you, Mr. Bajoka and Ms. Corrales for your arguments this morning. Thank you. We certainly appreciate them. The case will be submitted. And you may call the.